Sampson O. MADEJA; Jose Rodriguez; Michael Steven Mallars; Solvi P. Olafsson; and Olafur Skagvik, Plaintiffs,

v.

OLYMPIC PACKER, LLC, In Personam, and M/V Fierce Packer O.N. 546488 her engines, tackle, stores, and equipment freight, In Rem, Defendants.

No. CIV 00–00190 SOM–BMK.

United States District Court,
D. Hawaii.

July 13, 2001.

Jay Freidheim, Honolulu, HI, for Plaintiffs.

John O'Kane, Jr., Michael J. Nakano, Frame, Formby & O'Kane, Honolulu, HI, for Defendants.

***ORDER DENYING PLAINTIFFS' MOTION TO INCREASE BOND, OR IN THE ALTERNATIVE, TO REARREST THE VESSEL; ORDER DENYING PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW; ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW; FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER***

MOLLWAY, District Judge.

### INTRODUCTION.

This admiralty case was tried without a jury. The trial lasted four days. Plaintiffs Sampson O. Madeja ("Madeja"), Jose Rodriguez ("Rodriguez"), Michael Steven Mallars ("Mallars"), Solvi P. Olafsson ("Olafsson"), and Olafur Skagvik

("Skagvik") (collectively "Plaintiffs") brought this action to recover unpaid wages, penalty wages, damages for wrongful discharge, and various other damages from Defendant Olympic Packer, LLC ("Olympic"), *in personam*, and Defendant M/V Fierce Packer ("Fierce Packer"), *in rem* (collectively "Defendants"). Plaintiffs assert claims under 46 U.S.C. § 10313 and general maritime law.

The court holds that the Fierce Packer is not liable *in rem* for further payments not verified in the Complaint. The court finds Olympic liable *in personam* for unpaid wages owed to Mallars, Olafsson, and Skagvik for their work on the Fierce Packer between February 18, 2000 and the dates they left the Fierce Packer in March 2000. Olympic is also liable *in personam* for charges Olafsson incurred in renting a car to do the Fierce Packer's business between February 21 and March 17, 2000, and for telephone charges incurred by Skagvik between February 17 and March 5, 2000, in connection with Olympic Packer's business. The court denies all other claims by Plaintiffs, including claims for penalty wages and wrongful discharge. Accordingly, the court awards Rodriguez no damages; awards Mallars his wages from February 18 through March 5, 2000, plus prejudgment interest on those wages; awards Olafsson his wages from February 18 through March 17, 2000, plus car rental costs from February 21 through March 17, 2000, and prejudgment interest; and awards Skagvik his wages from February 18 through March 5, 2000, plus certain telephone costs and prejudgment interest.

## PLAINTIFFS' MOTION TO INCREASE BOND, OR IN THE ALTERNATIVE, TO REARREST THE VESSEL

On June 26, 2001, Plaintiffs moved to increase the security bond posted by Olympic Packer to release the vessel from arrest. Plaintiffs argue that their damages exceed the $135,000 bond posted by Olympic Packer on March 17, 2000. Because the court awards Plaintiffs less than the $135,000 bond, the court denies Plaintiffs' Motion To Increase Bond, or in the Alternative, To Rearrest the Vessel. The bond is ordered released, as no judgment is issuing against the Fierce Packer *in rem*.

## MOTIONS FOR JUDGMENT AS A MATTER OF LAW.

During the course of the trial, both Plaintiffs and Defendants brought motions for judgment as a matter of law under Fed.R.Civ.P. 52(c). The court took the motions under advisement but now denies both motions. The matters raised by the motions are best addressed in a full consideration of all the facts of this case and all of the applicable law. The court includes consideration of the issues raised in the motions in its Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

Whenever, in the following discussion, this court has mistakenly designated as conclusions of law what are really findings of fact, and vice versa, the court's statements shall have the effect they would have had if properly designated.

This bench trial was conducted in accordance with this court's trial procedures for civil nonjury trials. Pursuant to this court's Trial Procedures Memorandum, direct examinations of the following witnesses were submitted in the form of written declarations: Rodriguez, Olafsson, Mallars, Skagvik, Kim Hansen, and Steven Marsh. All of these witnesses appeared for live cross-examination and live redirect examination.[1] Testimony by Paul Schultz

---

1. In an effort to rule promptly on the merits

of the trial and to avoid the delay (and the

was by deposition designations in lieu of live testimony. Based on the testimony and the exhibits received in evidence, the court finds the following by a preponderance of the evidence. The findings of fact include findings only on those issues necessary for and relevant to this ruling.

### The Charter Agreement.

1. Olympic, a limited liability corporation organized under the laws of the State of Washington, is the legal owner of the Fierce Packer, a 163–foot vessel weighing 188 gross tons. *See* Edited Declaration of Kim Hansen (July 3, 2001) ("Hansen Dec.") ¶ 1. Olympic acquired the Fierce Packer in 1997. *See* Mallars Trial Testimony. The Fierce Packer was previously used by Olympic for fishing in waters off of Alaska, Korea, and Russia. *See* Hansen Dec. ¶ 1.

2. Kim Hansen Enterprises, Inc. ("KHE") is a member of Olympic and is also the vessel manager for the Fierce Packer. *See* Hansen Dec. ¶ 1; Deposition of Paul A. Schultz (March 17, 2000) ("Schultz Depo.") at 14; Second Edited Declaration of Michael Steven Mallars (June 29, 2001) ("Mallars Dec.") ¶ 23. Kim Hansen ("Hansen") is the president of KHE. *See* Hansen Dec. ¶¶ 4, 17. Paul Schultz ("Schultz") is employed by KHE as its vessel operations manager, and KHE has assigned management of the Fierce Packer to him. *See* Hansen Dec. ¶ 4; Edited Declaration of Olafur Skagvik (June 29, 2001) ("Skagvik Dec.") ¶ 39; Schultz Depo. at 6, 9. Schultz was in charge of the vessel whenever it was in its home port of Seattle. *See* Edited Declaration of Solvi P. Olafsson (June 29, 2001) ("Olafsson Dec.") ¶ 13; Olafsson Trial Testimony.

3. The court finds that, for purposes of this case, Hansen and Schultz had the authority to speak on behalf of Olympic and did so in matters such as the hiring and paying of crew members for Olympic.

4. On previous Fierce Packer voyages for Olympic Packer, Schultz had been responsible for hiring and paying the crew. *See* Olafsson Trial Testimony; Mallars Dec. ¶ 63; Schultz Depo. at 150. Steven A. Marsh ("Marsh") was the controller for Olympic and for KHE during all times relevant to this lawsuit. *See* Declaration of Steven A. Marsh ("Marsh Dec.") ¶ 1.

5. In 1999, activity in the fishing industry in Alaska and Russia lessened. *See* Hansen Dec. ¶ 2. The Fierce Packer was then no longer profitable in the fishing trade. *See* Hansen Dec. ¶ 2. In September or October 1999, Ron Ellis ("Ellis") contacted KHE about the possibility of purchasing or chartering the Fierce Packer. *See* Hansen Dec. ¶ 2. Following preliminary discussions, the Fierce Packer was chartered to Interisland Maritime Services, Inc. ("IMAR") on November 29, 1999. *See* Hansen Dec. ¶ 3.

6. Ellis signed the charter as president of IMAR on November 19, 1999. *See* Defendants' Ex. 001 (Bareboat Charter Agreement). However, although Olympic did not know it at the time, IMAR had not yet been incorporated as of that date. IMAR was not incorporated until December 3, 1999. *See* Plaintiffs' Ex. 82 (Articles of Incorporation) at 1.

7. The charter agreement was titled "Bareboat Charter Agreement." *See* De-

---

burden on the court's over-extended court reporters) that would accompany a request by the court for final trial transcripts, the court did not request and therefore does not have final transcripts of the live trial testimony. References to the live trial testimony are therefore based on the court's recollection and notes and on the court reporter's "rough" versions of the trial transcripts. Accordingly, this court is unable to give exact page and line citations to the trial testimony.

fendants' Ex. 001 (Bareboat Charter Agreement) at 1. Under the terms of the agreement, IMAR was to pay $1600 per day for the charter, payable in advance every fifteen days. *See* Defendants' Ex. 001 (Bareboat Charter Agreement) at 2. IMAR was responsible for operating expenses, supplies, crew payments, maintenance, repairs, and insurance for the Fierce Packer during the charter period. *See* Defendants' Ex. 001 (Bareboat Charter Agreement) at 1–4. However, because IMAR did not pay for insurance for the vessel during the charter, Olympic purchased insurance at Olympic's expense during IMAR's charter. *See* Hansen Trial Testimony; Marsh Trial Testimony.

8. During the IMAR charter period, neither Olympic nor KHE had any control over the crew or navigation of the Fierce Packer. *See* Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony. Nor did Olympic Packer control the hiring of the crew. *See* Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony. Olympic acted in accord with the charter document in giving full control of the Fierce Packer and its crew to IMAR or Ellis.

### IMAR Charter Period.

9. During the course of charter discussions, Ellis inquired as to the availability of crew for the Fierce Packer. *See* Hansen Dec. ¶ 4. Schultz informed Skagvik of Ellis' inquiry. *See* Hansen Dec. ¶ 4; Schultz Depo. at 130. Skagvik had been previously employed by Olympic and had been the master of the Fierce Packer on a number of voyages. *See* Hansen Dec. ¶ 4; Schultz Depo. at 130. Ellis agreed to hire Skagvik and asked him to get a crew together. *See* Schultz Depo. at 131.

10. Ellis hired Skagvik to be the captain (or "master") of the Fierce Packer on November 29, 1999. *See* Skagvik Dec. ¶ 6. Ellis orally promised to pay Skagvik $275 per day for his work on the Fierce Packer

during the IMAR charter. *See* Skagvik Dec. ¶¶ 3, 4. Skagvik never signed a written contract with Ellis for this employment. *See* Skagvik Trial Testimony.

11. On November 29, 1999, Ellis also hired Mallars as chief engineer for the Fierce Packer. *See* Mallars Dec. ¶ 6; Mallars Trial Testimony. Ellis orally promised to pay Mallars $250 per day for his work on the Fierce Packer during the IMAR charter. *See* Mallars Dec. ¶ 6. Mallars did not sign a written contract with Ellis for his employment. *See* Mallars Trial Testimony. Ellis showed Mallars a document titled "Master Contract for Employment on the M/V Fierce Packer." *See* Mallars Trial Testimony; Defendants' Ex. 002 (Master Contract for Employment). This document concerned Mallars' job functions on the Fierce Packer, behavioral guidelines, procedures for settling wages, termination, and prohibited substances. *See* Mallars Trial Testimony; Defendants' Ex. 002 (Master Contract for Employment). The document did not state Mallars' daily wage rate, or the duration of his hire. *See* Mallars Trial Testimony; Defendants' Ex. 002 (Master Contract for Employment). Mallars was not shown the signature page of this document and did not actually provide his full signature on any part of the document. Mallars only initialed certain places in the document. *See* Mallars Trial Testimony.

12. Although the document provided that wages would be paid at the end of the month, crew members understood that they would be paid at the end of each voyage.

13. The Fierce Packer left from Seattle, Washington, bound for Honolulu, on November 30, 1999. *See* Hansen Dec. ¶ 7; Mallars Trial Testimony.

14. On December 18, 1999, Ellis hired Rodriguez in Honolulu as a deckhand/cook on the Fierce Packer. *See* Edited Decla-

ration of Jose Rodriguez (July 3, 2001) ("Rodriguez Dec.") ¶ 3. Ellis orally promised to pay Rodriguez $125 per day, plus room and board. *See* Rodriguez Dec. ¶ 3. Rodriguez did not sign a written contract with Ellis. *See* Rodriguez Dec. ¶ 3. On December 19, 1999, Ellis showed Rodriguez the document titled "Master Contract for Employment on the M/V Fierce Packer." *See* Rodriguez Dec. ¶ 3; Rodriguez Trial Testimony; Defendants' Ex. 002 (Master Contract for Employment). This was the same document Mallars had seen. *See* Rodriguez Dec. ¶ 3; Defendants' Ex. 002 (Master Contract for Employment). Rodriguez' daily wage rate and the duration of his hire were not included in this document. *See* Defendants' Ex. 002 (Master Contract for Employment). Like Mallars, Rodriguez did not see the signature page or affix his full signature to the document. He was never given a copy of the document by Ellis and only initialed the document at certain places. *See* Rodriguez Dec. ¶ 3. Rodriguez served as a seaman aboard the Fierce Packer from December 18, 1999 to February 17, 1999. *See* Rodriguez Dec. ¶ 4.

15. The Fierce Packer went on three trips from Honolulu to Christmas and Fanning islands between December 18, 1999 and February 17, 2000. *See* Rodriguez Dec. ¶ 4. The first trip was from December 21, 1999 to January 4, 2000. *See* Rodriguez Dec. ¶ 4. The second trip was from January 13 through January 27, 2000. *See* Rodriguez Dec. ¶ 4. The last trip was from February 4 through February 17, 2000. *See* Rodriguez Dec. ¶ 4.

16. After the first trip, Ellis hired Madeja as a mate for the Fierce Packer on January 11, 2000. *See* Skagvik Dec. ¶ 8. Madeja was hired at a rate of $200 per day, plus room and board. *See* Skagvik Dec. ¶ 8. Madeja worked the Fierce Packer only for the second trip and ended his employment on January 28, 2000. *See*

Mallars Trial Testimony; Skagvik Trial Testimony.

17. After the second trip, Mallars and Skagvik spoke with Hansen by phone regarding the status of the IMAR charter. *See* Skagvik Dec. ¶¶ 86–90; Mallars Trial Testimony; Hansen Dec. ¶ 9. They told Hansen that shippers were beginning to complain about Ellis, and that Ellis was behind in his payment of the crew's wages. *See* Mallars Trial Testimony; Skagvik Trial Testimony. According to Skagvik and Mallars, Hansen told them that Ellis was also behind on payments for the charter. *See* Skagvik Dec. ¶ 87; Mallars Trial Testimony. Hansen denies having told them that before the third trip, as he did not consider IMAR to be delinquent at that time. *See* Hansen Trial Testimony. Hansen asked Mallars and Skagvik to check on the possibility of continuing cargo runs to Christmas and Fanning islands through Hansen, not IMAR. *See* Skagvik Dec. ¶ 88; Mallars Trial Testimony.

18. On January 31, 2000, Olafsson was hired by Skagvik, his father, to work as chief mate on the Fierce Packer. *See* Olafsson Dec. ¶ 3. Olafsson flew from Seattle to Honolulu with the expectation that he would be reimbursed by IMAR for his airfare of more than $500. He was orally promised a daily wage rate of $200 per day, plus room and board. *See* Olafsson Dec. ¶¶ 3, 4. Olafsson's hiring and daily wage rate were approved by Ellis. *See* Olafsson Dec. ¶ 3. Olafsson knew of the IMAR charter when he started working on the Fierce Packer. *See* Olafsson Trial Testimony. He said that IMAR controlled his work while he was on the Fierce Packer. Olafsson never signed a written contract with IMAR. *See* Olafsson Trial Testimony.

19. Before the third trip, the crew members got together to see if they could get a cargo operation going through some-

one other than IMAR. *See* Olafsson Trial Testimony. During the third trip, Olafsson and Mallars discussed with Leif Anderson ("Anderson"), vice-president of IMAR, the possibility of continuing operations under Hansen's management. *See* Olafsson Trial Testimony; Mallars Trial Testimony. According to Olafsson, Anderson wanted Hansen to take over management of the cargo runs for IMAR and Ron Ellis. *See* Olafsson Trial Testimony. Anderson asked Olafsson and Mallars to persuade Hansen to take over management of the Fierce Packer for Ellis. *See* Olafsson Trial Testimony; Mallars Trial Testimony. Anderson gave Olafsson documents, including a letter, to transmit to Hansen regarding this proposal. *See* Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony. Apparently because Anderson was contacting Hansen in Hansen's capacity as head of a company connected to Olympic, the letter stated that Anderson was interested in doing business with Olympic if Olympic would take over management of the Fierce Packer. *See* Plaintiffs' Ex. 108 (Letter from Anderson to Hansen, dated February 12, 2000). The letter was faxed to Hansen on February 17, 2000. *See* Plaintiffs' Ex. 111 (Facsimile Report).

20. Olafsson and Mallars also talked to several IMAR customers on the third trip to see if they would use the cargo service if Hansen took over management of the Fierce Packer. *See* Olafsson Trial Testimony; Mallars Trial Testimony. Several customers expressed interest in using the cargo service if Hansen managed it. *See* Olafsson Trial Testimony; Mallars Trial Testimony. Mallars and Olafsson did not believe that they were acting as Olympic employees while they were investigating the viability of operations under new management during the third trip. *See* Olafsson Trial Testimony; Mallars Trial Testimony. They both felt that they were IMAR's employees during this time, even though they were working on the possibility of replacing IMAR. *See* Olafsson Trial Testimony; Mallars Trial Testimony. They did not expect to be paid by Olympic for their efforts during the third trip to obtain customers. *See* Mallars Trial Testimony; Olafsson Trial Testimony.

21. When the Fierce Packer arrived back in Honolulu on February 17, 2000, Mallars, Olafsson, Rodriguez, and Skagvik learned from IMAR's Honolulu agent for the Fierce Packer that IMAR was in bankruptcy and that they had been fired for allegedly having consumed alcohol on the Fierce Packer. All four Plaintiffs denied having wrongfully consumed alcohol on the vessel. They testified that, despite the prohibition on alcohol in the document Mallars and Rodriguez had initialed, they understood the policy to be that alcohol could be consumed when the vessel was not under way. Ellis had even given them a bottle of wine to drink at Christmas, as they were scheduled to be at sea at Christmas. *See* Olafsson Dec. ¶¶ 5, 65; Rodriguez Dec. ¶ 3; Skagvik Dec. ¶ 11.

### *Post–IMAR Charter Period.*

22. On February 17, 2000, Skagvik called Kim Hansen in Seattle to inform him of the crew's termination and IMAR's bankruptcy. *See* Skagvik Dec. ¶ 17. Skagvik says that, during that conversation, Kim Hansen asked Skagvik to stay on the vessel, work the Fierce Packer, keep it operational, and wait for Schultz, who would be traveling to Hawaii from Korea. *See* Skagvik Dec. ¶¶ 18, 64; *see also* Olafsson Dec. ¶ 11; Mallars Dec. ¶ 14; Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony. According to Skagvik, Olafsson, and Mallars, Hansen told Skagvik to ask the rest of the crew to stay and work the Fierce Packer until Schultz arrived. *See* Skagvik Trial Testimony; Mallars Trial Testimony; Olafsson Trial Testimony. According to Skagvik,

Hansen promised Skagvik that he and the other crew members would be paid for the work they performed after February 17, 2000. *See* Skagvik Dec. ¶ 18. Skagvik relayed Hansen's request to the rest of the crew. *See* Skagvik Trial Testimony; Mallars Trial Testimony.

23. Hansen denies having made any commitments on behalf of KHE or Olympic to Skagvik on February 17, 2000. *See* Hansen Dec. ¶ 10; Hansen Trial Testimony. Given the considerable confusion that IMAR's bankruptcy caused for everyone, the differing versions of the conversation are understandable. All of the witnesses who testified live before the court appeared to the court to be testifying in good faith, and the court has no reason to think that anyone was being deliberately untruthful.

24. The court does, however, find Skagvik's version of the conversation to be more convincing under the circumstances. Hansen says he told Skagvik to wait for Schultz to arrive. Hansen knew that it would take some time for Schultz to make his way from Korea to Hawaii. Hansen could not have thought that he could require Skagvik or his crew members to wait for days on the vessel with no assurance of being paid and no assurance that another voyage would begin shortly. Hansen needed to ensure that the Fierce Packer was not damaged by weather or vandalized while Olympic decided what to do in light of IMAR's bankruptcy. Hansen had also been exploring customer leads in the hopes of arranging voyages for the Fierce Packer that might occur in the near future. Given these circumstances, Hansen wanted the crew to remain on the Fierce Packer at least until Schultz arrived, and that could only be accomplished by assurances that payment would be made.

25. Schultz arrived in Honolulu on February 21, 2000. *See* Olafsson Dec. ¶ 9. Olafsson says that each crew member told Schultz how much the crew member was owed for work done during the IMAR charter. *See* Olafsson Dec. ¶ 14. On the day he arrived, Schultz, according to crew members, orally promised they would be paid their regular rates for work performed after they were fired by IMAR on February 17, 2000. *See* Olafsson Dec. ¶¶ 13, 15, 44, 90; Mallars Dec. ¶¶ 15, 29, 51, 54; Skagvik Dec. ¶ 65; Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony. They say that Schultz told them that he was Olympic's representative. *See* Rodriguez Trial Testimony; Olafsson Dec. ¶ 35; Skagvik Dec. ¶ 21; Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony. Schultz, like Hansen, denies having committed to pay the crew members, saying instead that he told them, at Hansen's instruction, that they should hire a lawyer to pursue their wage claims in IMAR's bankruptcy proceedings. Schultz Depo. at 89–91. Schultz says he never answered their question about whether Olympic would pay them. Schultz Depo. at 212. Because Schultz testified by way of deposition, this court had no opportunity to judge his credibility by observing his demeanor or hearing how he testified. However, the court notes that, after he says he told the crew members to seek payment from IMAR, Schultz observed crew members working on the Fierce Packer for Olympic's benefit and incurring expenses in that connection. Schultz Depo. at 52–62.

26. Olympic had usually had crew members sign written contracts that listed wage rates. *See* Defendants' Ex. 003 (Olympic Packer Employment Contract). Olympic did not present such written contracts to Plaintiffs after February 17, 2000. Although there was some testimony that the crew members thought that, after February 17, 2000, they were working under the conditions in the standard Olympic

written contract, there is no indication that Olympic had that understanding.

27. Schultz was very much aware that Olafsson was incurring car rental charges after Schultz arrived in Honolulu. Olafsson, apparently without obtaining approval, had rented a car in Honolulu on February 17, 2000. *See* Olafsson Dec. ¶ 76. Olafsson had intended to return the car to the rental car company when Paul Schultz arrived in Honolulu on February 21, 2000, expecting that Schultz would rent a car at KHE's expense and use that car for any work that needed to be done. *See* Olafsson Dec. ¶ 9; Olafsson Trial Testimony. However, Paul Schultz did not have the necessary identification to rent a car on February 21, 2000. *See* Olafsson Dec. ¶ 9; Schultz Depo. at 176–78. Schultz asked Olafsson to keep the car in Olafsson's name and promised Olafsson that Olympic would pay him for the rental car. *See* Olafsson Dec. ¶ 9; Olafsson Trial Testimony; Schultz Depo. at 176–78. Olafsson was never reimbursed for the rental car charges he incurred on his credit card. *See* Olafsson Trial Testimony.

28. After Schultz arrived in Honolulu, Olafsson, Skagvik, and Mallars worked under his direction. *See* Olafsson Dec. ¶ 36; Olafsson Trial Testimony; Mallars Dec. ¶ 23; Mallars Trial Testimony; Skagvik Trial Testimony. During this period, Olafsson, Mallars, and Skagvik made repairs to the vessel, kept the vessel clean, and maintained the systems and generators. *See* Olafsson Dec. ¶ 20; Mallars Trial Testimony; Skagvik Trial Testimony; Schultz Depo. at 52–62. Specifically, they worked on the steering system, the transmission, the satellite communication system, the electronic equipment, and the anchor motor. *See* Skagvik Dec. ¶¶ 23, 24; Mallars Dec. ¶¶ 16–18; Olafsson Trial Testimony; Schultz Depo. at 22–23; Skagvik Trial Testimony; Mallars Trial Testimony; Schultz Depo. at 52–62.

29. Skagvik, Mallars, and Olafsson had to move the vessel three times between February 18, 2000 and March 5, 2000, to accommodate other freight vessels that were bringing in cargo. *See* Olafsson Dec. ¶ 22; Mallars Dec. ¶ 20; Schultz Depo. at 112–18. Schultz was on the vessel on all three occasions. *See* Olafsson Dec. ¶ 22; Schultz Depo. at 112–18. Because Skagvik, Mallars and Olafsson were also constantly on the vessel, they performed "watch" functions during this period, although they did not have formal watch hours. *See* Olafsson Trial Testimony. Olafsson ran many errands for Schultz to pick up supplies or materials needed for the Fierce Packer. *See* Olafsson Trial Testimony.

30. Within the first few days after Schultz arrived in Honolulu, Skagvik, Olafsson, Mallars, and Schultz discussed the possibility of another trip between Hawaii and Christmas and Fanning islands to transport cargo under Hansen's management. *See* Olafsson Dec. ¶ 18; Schultz Depo. at 100–03. Skagvik, Olafsson, and Mallars worked to help put together this potential cargo run for the Fierce Packer. *See* Olafsson Dec. ¶ 18; Olafsson Trial Testimony; Skagvik Trial Testimony; Mallars Trial Testimony. Schultz instructed Olafsson to create a flier to advertise the runs. *See* Olafsson Trial Testimony. Olafsson and Mallars prepared a flier, and Skagvik, Mallars and Olafsson faxed out copies of the flier to potential customers. *See* Olafsson Dec. ¶¶ 19, 56; Skagvik Dec. ¶ 75, Plaintiffs' Ex. 26 (Flier); Olafsson Trial Testimony; Mallars Trial Testimony; Schultz Depo. at 221–22.

31. Skagvik, Mallars, and Olafsson also talked to several customers by cellular phone about the possibility of a voyage to Christmas and Fanning islands. *See* Skagvik Dec. ¶¶ 22, 68; Olafsson Dec. ¶ 19; Mallars Dec. ¶ 21. Skagvik, Mallars, and

Olafsson received cargo from some customers to ship to Christmas and Fanning islands as a result of their efforts. *See* Olafsson Trial Testimony.

32. Schultz told Olafsson that if the Fierce Packer did not make the trip to Christmas and Fanning islands, then the Fierce Packer might return to Seattle. *See* Olafsson Trial Testimony. Neither Hansen nor Schultz made any commitment to make the voyage to Christmas Island or Fanning Island, or to Seattle. *See* Hansen Dec. ¶¶ 10, 11; Trial Testimony of Hansen; Schultz Depo. at 99–104, 183–84. These voyages were merely a possibility that was discussed among Hansen, Schultz, and the crew. *See* Hansen Dec. ¶¶ 10, 11; Hansen Trial Testimony; Schultz Depo. at 99–104, 183–84.

33. Sometime after February 21, 2000, Schultz accepted a check for $8,000 that was owed to Ellis and IMAR for having delivered cargo from the Fierce Packer during the IMAR charter. *See* Olafsson Dec. ¶ 16. The check was written to "cash." *See* Olafsson Dec. ¶ 16. Olafsson cashed the check for Schultz because Schultz did not have the two pieces of identification required to cash a check. *See* Olafsson Dec. ¶ 16; Schultz Depo. at 119–20. After Olafsson cashed the check, he gave Schultz the entire amount from the check. *See* Olafsson Dec. ¶ 16.

34. Using the money from the cashed check, Schultz paid $1,000 to Olafsson, $500 to Rodriguez, $1,000 to Mallars, and $1000 to Skagvik as a draw. While the testimony was not entirely clear on whether the money was a draw against the money owed for work done under the IMAR charter, or against money owed for work done after IMAR had declared bankruptcy and the crew had been fired by IMAR, the court finds that the preponderance of the evidence was that the draw was for work done under the IMAR charter. *See* Olafsson Dec. ¶ 16; Rodriguez

Dec. ¶ 6; Mallars Dec. ¶ 9; Skagvik Dec. ¶ 59; Olafsson Trial Testimony; Rodriguez Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony; Schultz Depo. at 38–39, 44–45, 128.

35. At some point between February 21 and March 5, 2000, according to Mallars, Olafsson, and Skagvik, Schultz asked them if they would continue to work the boat for half of their usual wages. *See* Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony. The three men say they declined Schultz's offer to work for half of their daily wage rate. *See* Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony. Schultz, however, says that the only person that he hired during this period was Olafsson. Schultz says that he hired Olafsson on March 5, 2000, and that Olafsson agreed to work from that date for $100 per day (half Olafsson's regular rate of pay). Schultz Depo. at 204–05, 210–11. As noted above, this court has already found that Olympic had agreed to hire Olafsson, Mallars, and Skagvik after they were terminated by IMAR. There is no evidence that any of them thereafter agreed to a reduced rate of pay.

36. Olafsson did not agree to a reduced rate of pay from March 5, 2000. As there is no evidence that Olafsson would be doing less work from March 5, 2000, a reduced rate of pay would not have made sense. To the contrary, because Mallars and Skagvik left Honolulu on March 5, 2000, Olafsson could have expected to have to do more work. Given these circumstances, this court accepts Olafsson's testimony that he rejected the request from Schultz that he work at half pay.

37. Skagvik says that Schultz also promised him that the cellular phone charges Skagvik incurred doing business for Olympic would be paid for by Olympic. *See* Skagvik Dec. ¶¶ 22, 72, 119. Skagvik

estimates that 80 percent of his February phone bill of $839.39 was used for the benefit of Fierce Packer. *See* Skagvik Dec. ¶¶ 22, 71. Skagvik failed to provide details supporting that estimate in its entirety, but it is undisputed that KHE's office number in Seattle at the time was (425) 670–2007, and calls to that number were clearly work-related. *See* Skagvik Trial Testimony. Although KHE had a toll-free number that Skagvik could have used, Marsh, KHE's controller, said that use of the toll-free number might not have saved Skagvik any money, as Skagvik may have been charged for air time on his cellular telephone even with a toll-free number. *See* Marsh Trial Testimony. Moreover, it is not clear that Skagvik and the other crew members knew the toll-free number. *See* Mallars Trial Testimony.

38. Skagvik also made numerous local calls during the time the Fierce Packer was in Hawaii. While the court has no evidence that Skagvik's telephone was used for social telephone calls in Hawaii, the court does have evidence that various repairs on the ship had to be made while it was in Hawaii. Those repairs appear to have required telephone communication with local sources. *See* Schultz Depo. at 52–62. The court therefore finds that Skagvik's local calls while he was in Hawaii were work-related. Accordingly, Skagvik is entitled to be reimbursed for calls to Olympic's Seattle office and for local calls while he was in Honolulu.

39. Skagvik left the Fierce Packer on March 5, 2000. *See* Skagvik Dec. ¶ 35. Schultz bought Skagvik a round-trip ticket to Seattle with a March 12, 2000 return date. *See* Skagvik Dec. ¶ 35. When Skagvik returned to Seattle, he was told by Olympic representatives that he had to fire his lawyer if he wished to continue to work on the Fierce Packer. *See* Skagvik Dec. ¶ 49. Skagvik did not fire his lawyer and did not return to Honolulu to work on the Fierce Packer. *See* Skagvik Dec. ¶ 48.

40. Mallars also left the Fierce Packer on March 5, 2000. *See* Mallars Trial Testimony. Mallars received a round-trip ticket from Schultz, with a return date from Seattle to Honolulu of March 12, 2001. *See* Mallars Trial Testimony. On March 10, 2000, Schultz called Mallars and told him that the voyage to Christmas or Fanning islands was not going to commence and that Mallars did not need to return to Honolulu for a voyage. Mallars did not return to Honolulu in light of Schultz's instruction on March 10 "not to bother." *See* Mallars Trial Testimony.

41. Mallars was not paid for work done between February 18 and March 5, 2000. *See* Mallars Dec. ¶ 55; Mallars Trial Testimony. Skagvik was not paid for work done between February 18 and March 5, 2000. *See* Skagvik Trial Testimony. Olafsson was not paid for work done between February 18 and March 17, 2000. *See* Olafsson Trial Testimony.

42. On a previous trip, the crew had been paid wages when the Fierce Packer had stopped, in the course of a voyage, and anchored in ports other than the home port of Seattle. *See* Olafsson Dec. ¶ 39. When Olympic ran the voyages, Olympic had always paid Olafsson and Mallars for work aboard the vessel, whether it was under way, or in port in the midst of a voyage. *See* Olafsson Dec. ¶ 50; Mallars Dec. ¶ 46; Skagvik Dec. ¶ 34. Mallars had always been paid daily crewman's wages any time the Fierce Packer was away from its home port of Seattle. *See* Mallars Dec. ¶ 22, 23.

43. Beginning on February 17, 2000, Rodriguez, Olafsson, Skagvik, and Mallars made repeated demands on Olympic through KHE for their unpaid wages. *See* Rodriguez Dec. ¶ 8; Olafsson Dec. ¶ 55, 89; Mallars Dec. ¶ 45; Skagvik Dec. ¶ 36;

Rodriguez Trial Testimony; Mallars Trial Testimony. The crew asked an attorney to make a written demand for unpaid wages, penalties, and severance pay. *See* Rodriguez Dec. ¶ 18; Mallars Dec. ¶ 38. The attorney made this written demand on March 15, 2000. *See* Rodriguez Dec. ¶ 18; Olafsson Dec. ¶ 70.

### *Arrest of The Fierce Packer.*

44. The vessel was arrested by Plaintiffs on March 8, 2000. *See* Olafsson Trial Testimony. The substitute custodian of the vessel appointed by the court, Dennis Smith, offered to let Schultz and Olafsson remain on the vessel to perform custodial duties. This arrangement saved Olympic the extra custodial costs of paying Smith's assistants to stay on the boat and maintain the vessel. *See* Olafsson Trial Testimony. According to Olafsson, Schultz therefore asked Olafsson to continue to stay and work on the boat for Olympic at his regular daily rate until the vessel was released. *See* Olafsson Trial Testimony. Smith never offered any wages to Olafsson or asked him to work the boat. *See* Olafsson Trial Testimony.

45. Olafsson took care of the vessel while it was in custody from March 8 to March 17, 2000. *See* Olafsson Dec. ¶ 21. During this period, Olafsson had to stay on the vessel almost twenty-four hours a day to keep watch. *See* Olafsson Trial Testimony. Olafsson maintained the generator, checked the bilges, and performed other maintenance duties on the vessel. *See* Olafsson Trial Testimony; Schultz Depo. at 52–62. The vessel was released on March 17, 2000, after Olympic paid Plaintiffs' wage claims, as quantified in the affidavits attached to their Verified Complaint, and posted a $135,000 bond with the court.

46. Schultz and Olafsson mutually agreed to terminate his employment on March 17, 2000. *See* Olafsson Trial Testimony.

47. Schultz told Olafsson that, if the Fierce Packer made a voyage to Christmas Island or Fanning Island, Olafsson could come back to work on the Fierce Packer for that voyage. *See* Olafsson Trial Testimony. Olafsson paid for his airfare from Honolulu to his home in Seattle. *See* Olafsson Dec. ¶ 6. There is no evidence that anyone representing Olympic promised to pay for or reimburse him for that airfare, although Olympic had paid airfare for Mallars and Skagvik.

48. On June 2, 2000, Plaintiffs made a claim in bankruptcy against IMAR for unpaid wages and wage penalties. *See* Rodriguez Trial Testimony; Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony; Plaintiffs' Ex. 120 (Proof of Claim Form for Olafsson); Plaintiffs' Ex. 121 (Proof of Claim Form for Mallars). Plaintiffs' bankruptcy claims are still pending. *See* Rodriguez Trial Testimony; Olafsson Trial Testimony; Mallars Trial Testimony; Skagvik Trial Testimony.

### *The Commencement of The Next Voyage.*

49. Some of the cargo gathered by Schultz, Olafsson, Mallars, and/or Skagvik between February 21 and March 17, 2000, was eventually shipped out on the Fierce Packer to Christmas Island. *See* Hansen Trial Testimony. It is impossible to determine from the record whether this cargo was cargo that Schultz alone was responsible for having obtained or cargo that Olafsson, Mallars, and/or Skagvik were solely or partly responsible for having obtained. While, as noted earlier, Olafsson testified that crew members actually received cargo to be shipped out that they had obtained through their efforts, the court cannot determine on the present record whether that particular cargo was actually shipped on the Fierce Packer. Nor can the court determine when, if the cargo was shipped on the Fierce Packer, that

activity occurred. Although the parties had earlier hoped that a new voyage would begin on March 12, 2000, the boat did not leave on that date. Indeed, the vessel was still under arrest at that time. Eventually, the boat did leave on a voyage, but it is not clear when that occurred. Accordingly, the court finds that Plaintiffs have not shown by a preponderance of the evidence that cargo they participated in gathering was shipped out of Honolulu on the Fierce Packer on a voyage that was actually planned, imminent, or even anticipated at the time Plaintiffs were working for Olympic.

### Damages.

#### Madeja.

50. Because Madeja failed to prove that he was not paid his wages for the second trip, the court finds no liability against Olympic or the Fierce Packer for Madeja's claims. At most, there is evidence as to Madeja's hourly rate, evidence from the vessel log as to the days that he was on the Fierce Packer, and evidence that he received payment in a certain amount. There is, however, no evidence as to whether he had received earlier payments for all or some of the days he was on the vessel, or evidence that the payment that is in evidence should have been paid to him earlier. His damages are accordingly not capable of being calculated.

#### Against the Fierce Packer In Rem.

51. The Fierce Packer was liable *in rem* for the unpaid wages earned by Rodriguez, Olafsson, Mallars, and Skagvik during the IMAR charter. These wages were due on February 17, 2000. As more specifically detailed in the paragraphs below, Olympic paid Plaintiffs these wages (i.e., wages at the daily rate multiplied by the number of days worked, not including any penalties, prejudgment interest, or expenses claimed) for the IMAR charter. Olympic did this to obtain release of the Fierce Packer after it had been arrested. Payment was made on March 15, 2000.

52. The court has calculated the amount Rodriguez was owed for the seventeen days of work he did for the third trip. He was not paid for any of that work as of February 17, 2000. See Rodriguez Dec. ¶ 4, 6. At a rate of $125 per day, Rodriguez was owed $2,125 ($125 per day × 17 days) for the seventeen days of work performed for the third trip. On February 29, 2000, Schultz paid Rodriguez $500 as a draw against the money he was owed for work done during the third trip under the IMAR charter. See Rodriguez Dec. ¶ 6; Rodriguez Trial Testimony; Schultz Depo. at 39, 44–45, 128. Schultz paid the remaining $1,625 that was owed to Rodriguez for work done during the third trip on March 15, 2000. See Rodriguez Dec. ¶ 6.

53. As of February 17, 2000, Olafsson was owed $3,600 in unpaid wages for work done during the IMAR charter. See Olafsson Dec. ¶ 6. On February 29, 2000, Schultz paid Olafsson $1,000 as a draw against the money he was owed for work done under the IMAR charter. See Olafsson Dec. ¶ 5; Schultz Depo. at 39, 44–45, 128. Olympic Packer paid the remaining $2,600 that was owed to Olafsson for work done during the third trip on March 15, 2000. See Olafsson Dec. ¶ 8. Although Olafsson now claims that he should have been reimbursed for airfare, that reimbursement is not mentioned in his Verified Complaint.

54. As of February 17, 2000, Mallars was owed $8,030 for work performed under the IMAR charter. See Mallars Dec. ¶ 8. On February 29, 2000, Paul Schultz paid Mallars $1,000 as a draw against the money he was owed for work done under the IMAR/Ellis charter. See Mallars Dec. ¶ 9, 27; Mallars Trial Testimony; Schultz Depo. at 39, 44–45, 128. Olympic Packer paid the remaining $7,030 that was owed

to Mallars for work done during the IMAR charter on March 15, 2000. *See* Mallars Dec. ¶ 10, 34.

55. As of February 17, 2000, Skagvik was owed $10,200 in unpaid wages. *See* Skagvik Dec. ¶ 14. On February 29, 2000, Paul Schultz paid Skagvik $1,000 as a draw against the money he was owed for work done under the IMAR charter. *See* Skagvik Dec. ¶ 15; Skagvik Trial Testimony; Schultz Depo. at 38, 44–45, 128. Olympic Packer paid the remaining $9,200 that was owed to Skagvik for work done during the IMAR/Ellis charter on March 15, 2000. *See* Skagvik Dec. ¶ 16.

### Against Olympic Packer In Personam

56. The court awards damages against Olympic for the post-IMAR period as follows:

| Olafsson | $5,800.00 | wages owed | (2/18/00–3/17/00) |
|---|---|---|---|
| | + $ 900.64 | car rental | (2/21/00–3/17/00) |
| | $6,700.64 | total | |
| Mallars | $4,250.00 | wages owed | (2/18/00–3/5/00) |
| Skagvik | $4,675.00 | wages owed | (2/18/00–3/5/00) |
| | + $ 126.43 | cellular phone | (2/3/00–2/28/00) |
| | $4,801.43 | total | |

57. Olafsson was not paid for the work he performed between February 18 and March 17, 2000. Accordingly, the court awards Olafsson $5,800 (29 days × $200 per day) in wages for his work between February 18 and March 17, 2000.

58. Olafsson rented a car at a cost of $34.64 per day ($1039.26 ÷ 30 days). *See* Olafsson Dec. ¶ 76. Paul Schultz agreed to pay Olafsson for the rental car for its use between February 21, 2000 and March 17, 2000 (26 days). *See* Olafsson Dec. ¶ 9, 95. The court therefore awards $900.64 (26 days × $34.64 per day) to Olafsson for rental car cost. The court does not award car rental costs for the period from February 17 to February 21, 2000, as there is no evidence the rental for that period was agreed to by Olympic.

59. The court does not award Olafsson the cost of his airfare back to Seattle from Honolulu, as there is no evidence that Olympic agreed to pay that. For purposes of the work Olafsson did between February 18 and March 17, 2000, Olafsson was hired by Olympic in Honolulu and completed his work in Honolulu. Olympic did not promise to "repatriate" him to Seattle.

60. Mallars was not paid for the work he performed between February 18 and March 5, 2000. *See* Mallars Dec. ¶ 11. The court awards Mallars $4,250 for the work he performed between February 18 and March 5, 2000 ($250 per day × 17 days).

61. Skagvik was not paid for the work he performed between February 18 and March 5, 2000. *See* Skagvik Dec. ¶ 16. The court finds that Skagvik is owed $4,675 ($275 per day × 17 days) by Olympic for the work he performed for the Fierce Packer between February 18 and March 5, 2000.

62. Skagvik is entitled to be reimbursed for calls to Olympic's Seattle office and for local calls while he was in Honolulu. The total amount that Skagvik was charged for these calls is $126.43. The court therefore awards Skagvik $126.43 for his phone bill.

### Prejudgment Interest.

63. To fully compensate Plaintiffs, this court awards prejudgment interest on the amounts to be paid by Olympic *in personam*. In its discretion, the court runs prejudgment interest for Olafsson from

March 17, 2000, for Mallars from March 5, 2000, and for Skagvik from March 5, 2000. Prejudgment interest is awarded at the rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

The court has taken the average of the weekly figures and used that average as the prejudgment interest rate. Thus, for example, the court has taken the average of all the weekly yields for the period from March 17, 2000, to date, and used that average as Olafsson's prejudgment interest rate.

| Olafsson | $6,700.64 for wages and car rental | From 3/17/00 to July 13, 2001 (483 days) | Average "weekly average 1–year constant maturity Treasury yield" for period = 5.37% | per diem rate of $0.98582018 63014 | Prejudgment interest = $476.15 |
|---|---|---|---|---|---|
| Mallars | $4,250.00 for wages | From 3/5/00 to July 13, 2001 (495 days) | Average "weekly average 1–year constant maturity Treasury yield" for period = 5.39% | per diem rate of $0.62760273 9726 | Prejudgment interest = $310.66 |
| Skagvik | $4,675.00 for wages | From 3/5/00 to July 13, 2001 (495 days) | Average "weekly average 1–year constant maturity Treasury yield" for period = 5.39% | per diem rate of $0.69036301 36986 | Prejudgment interest = $341.73 |
| | $126.43 for cellular phone | From 2/28/00 to July 13, 2001 (501 days) | Average "weekly average 1 year constant maturity Treasury yield" for period = 5.40% | per diem rate of $0.01870471 232877 | Prejudgment interest = $9.37 |

### CONCLUSIONS OF LAW.

■ 1. A suit for a seaman's personal wages is properly before a district court under its maritime jurisdiction. *United States Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 353, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971). Accordingly, this court has jurisdiction over this matter under 28 U.S.C. § 1333. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

■ 2. After the close of the evidence, Defendants argued for the first time that this case should have been tried in a different district pursuant to the forum selection clause in Olympic's standard employment contract. *See* Defendants' Ex. 003 (Olympic Packer Employment Contract). How-

ever, there was no evidence that the parties had agreed to that forum selection provision. The parties had an oral contract pursuant to which, after February 17, 2000, Mallars, Olafsson, and Skagvik worked on the Fierce Packer for Olympic. Even if Plaintiffs assumed that some of the conditions in Olympic's standard employment contract were part of the oral agreement, there is no evidence Olympic had the same understanding. Thus, there was no meeting of the minds on this provision. Even had there been an agreement on this subject, Defendants have waived enforcement of the forum selection clause by waiting until after the evidence closed to raise it. *See Teyseer Cement Co. v. Halla Maritime Corp.*, 794 F.2d 472 (9th Cir.1986) (stating that a defendant may waive an

objection to venue based on a forum selection clause through consent or conduct).

### Skagvik's Claims Under 46 U.S.C. § 10313.

■ 3. Skagvik claims entitlement to wages under 46 U.S.C. § 10313. Defendants say that Skagvik is not entitled to statutory wages because, as master of the Fierce Packer, he is barred from recovering wages under that statute. Defendants argue that section 10313's wage recovery provisions apply only to seamen, not to masters of a vessel. The court agrees with Defendants.

4. Section 10313 provides remedies for seamen to recover wages and penalty wages. These sections, however, do not include masters of vessels in their remedy provisions, despite the separate mention of masters throughout the Seaman's Wage Act, 46 U.S.C. §§ 10101–11501. The court finds that this omission was not accidental, insofar as masters have traditionally been excluded from the special statutory protections afforded wage claims by common seamen. As stated by the Supreme Court in reference to a previous version of the Seaman's Wage Act:

[M]aritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a "ward of the admiralty," often ignorant and helpless and so in need of protection against himself as well as others. The master, on the other hand, is able in most instances to drive a bargain for himself, and then when the bargain is made, to stand upon his rights. Discrimination may thus be rational in respect of remedies for wages.

*Warner v. Goltra,* 293 U.S. 155, 162, 55 S.Ct. 46, 79 L.Ed. 254 (1934).

5. This difference in treatment has been continued in the Seaman's Wage Act in the long-standing separate statutory definitions provided for the terms "master" and "seaman." *See* 46 U.S.C. § 10101(1) & (3) (setting forth the separate definitions); *cf. Blackton v. Gordon,* 303 U.S. 91, 93–94, 58 S.Ct. 417, 82 L.Ed. 683 (1938) (noting that masters and seamen were to be afforded different treatment under the wage statute, as Congress had maintained the same distinction in the statutory definitions despite numerous other amendments). Although Congress has amended the Seaman's Wage Act since the Court's decisions in *Warner* and *Blackton,* the distinction between master and seamen has been maintained. Consequently, as one court has stated:

The [s]tatute's words must be given their plain meaning and precedent and Congress' intent must be deferred to. Although the trend in other areas of maritime law may be to favor inclusion of the master in remedies afforded to seamen, as certainly it should, 46 U.S.C. § 10313 still provides a remedy only to seamen, and not to the master of a vessel. It is up to Congress, rather than the courts, to change the language of the provision.

*George v. Kramo, Ltd.,* 796 F.Supp. 1541, 1548 (E.D.La.1992); *see also Rothmann v. S/S President Taft,* No. C 94–2935 FMS, 1995 WL 458979, at *5 (N.D.Cal. Nov.14, 1994) (concluding that "section 10313 provides a remedy for earned wages and penalty wages only to seamen, and not to masters").

6. The statutory exclusion of a master does not, by its terms, turn on what work the master performs. Thus, Skagvik's argument that, although he was the master, he performed a seaman's tasks, is unavailing. It is notable that, while arguing that he acted as a seaman, Skagvik claims wages at a master's rate, even for work done for Olympic in Honolulu. Given the law applicable to the facts of this case, the court concludes that Skagvik is unable to

prevail on any claim under 46 U.S.C. § 10313.

7. This conclusion, however, does not preclude all avenues of recovery for Skagvik. Skagvik may recover for breach of a maritime contract for employment. Skagvik's remaining claims are discussed later in these Conclusions of Law.

### IMAR Charter Period.

8. Plaintiffs assert several claims under 46 U.S.C. § 10313 and general maritime law against Olympic and the Fierce Packer for the work Plaintiffs performed during the IMAR charter period. First, Plaintiffs seek to recover for unpaid wages. Second, Plaintiffs assert a claim for penalty wages. Third, Plaintiffs seek to recover for wrongful discharge. Fourth, Olafsson seeks his airfare from Seattle to Honolulu.

■■■ 9. The Seaman's Wage Act, 46 U.S.C. § 10313, "protects seafarers from the efforts of unscrupulous shipowners to take advantage of their superior economic position to withhold payment of promised wages." *Su v. M/V Southern Aster*, 978 F.2d 462, 465 (9th Cir.1992), *cert. denied*, 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 244 (1993). The Wage Act ensures that seamen receive timely payment of their wages. *See id.* at 468. The Wage Act shields seamen from the "harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class they are peculiarly exposed." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 572, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (quotation omitted). To protect seamen from unscrupulous employers, the Wage Act imposes liability "which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible." *Collie v. Fergusson*, 281 U.S. 52, 55–56, 50 S.Ct. 189, 74 L.Ed. 696 (1930). In light of this purpose, section 10313 and its predecessors have been liberally construed in

favor of seamen. *See Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 781, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952) (noting that "whenever congressional legislation in aid of seamen has been considered here, since 1872, the Court has emphasized that such legislation is largely remedial and calls for a liberal interpretation in favor of seamen").

■■ 10. The Wage Act's full wage provision requires prompt payment of wages at the completion of a voyage:

> At the end of a voyage, the master shall pay each seafarer the balance of wages due the seafarer within 24 hours after the cargo has been discharged or within 4 days after the seafarer is discharged, whichever is earlier.... When the payment is not [timely] made ... without sufficient cause, the master or owner shall pay to the seafarer 2 days' wages for each day payment is delayed.

46 U.S.C. § 10313(f), (g). Necessary to recovery under this provision is a showing that: (1) the voyage ended; (2) either the cargo or the seafarer has been discharged; and (3) payment was withheld without sufficient cause. *See Southern Aster*, 978 F.2d at 467–68. "The seamen bear the burden of showing that the shipowners paid less than the full amount of wages due." *See id.* at 468.

### Madeja's Claims.

11. As a preliminary matter, the court addresses the merits of Madeja's claims against Olympic and the Fierce Packer. Madeja's only claims in this case are for unpaid wages and penalty wages for the work he performed during the second trip under the IMAR charter. Madeja did not appear at trial, however, and has no statement or testimony in evidence. Madeja instead argues that his claims have been proven by the testimony of other Plaintiffs in this case.

■ 12. As noted above, the "seamen bear the burden of showing that the shipowners paid less than the amount due." *Id.* Madeja has failed to meet his burden. The present record does not establish by a preponderance of the evidence that Madeja was paid less than the wages he was owed under the IMAR charter. None of the other Plaintiffs states this. At most, Skagvik testified that IMAR hired Madeja to work on the second trip for $200 per day, and that Madeja worked on the Fierce Packer for the second trip and ended his employment on January 28, 2000. There is no evidence in the record demonstrating that his wages were not paid.

13. Madeja argues that Defendants' Ex. 013 (a check to Sampson Madeja and his attorney) demonstrates that he was owed wages for the second trip under the IMAR charter. Defendants' Ex. 013 is a check written by Olympic's counsel made payable to Madeja and his attorney. Madeja asserts that the check is evidence that he was owed wages for his work under the IMAR charter. Although this check was received into evidence, there was no accompanying testimony identifying the check or explaining the check's significance. The check states that it is to pay "crewmember wages" on the Fierce Packer. However, the court cannot assume, without evidence in the record, that the check covered wages actually owed under the IMAR charter. Olympic may have just paid the amount demanded so that the arrest of the Fierce Packer would end. The check in and of itself is not an admission by Defendants that Madeja was owed money for his work under the IMAR charter. Accordingly, Defendants are entitled to judgment on all of Madeja's claims.

### Wage Claims.

14. Each Plaintiff entered into an oral agreement with IMAR. Defendants argue that Plaintiffs cannot recover wages under the IMAR charter pursuant to 46 U.S.C. § 10313 because agreements under this section must be in writing. *See* 46 U.S.C. § 10302 (stating that agreements under this chapter must be "in writing with each seaman before the seaman commences employment"). Defendants are unpersuasive on this point.

■ 15. "It is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). As the Supreme Court noted in *Kossick*, the rule, stated in an earlier version of section 10302, that a seamen's contract of hire had to be in writing was instituted to protect seamen, and in no way assumed invalidity of oral contracts. *See id.* Valid oral contracts are enforceable under section 10313.

■ 16. As there is no dispute that IMAR or Ellis hired Plaintiffs to work aboard the Fierce Packer, Plaintiffs were entitled to receive wages for work done during the IMAR charter. However, those wages earned during the IMAR charter, while recoverable against the Fierce Packer *in rem*, are not recoverable from Olympic *in personam*.

### Against Olympic In Personam.

■ 17. Plaintiffs first seek to recover unpaid wages against Olympic for work done under the IMAR charter. Plaintiffs argue that Olympic was the owner of the vessel under the IMAR charter and is liable for their wage claims. Generally, the owner of a vessel is liable for a seaman's wages. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 341, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). However, when the owner places "the ship in the exclusive possession and control of another, such other becomes the owner *pro hac vice* with respect to liability for wages and other expenses." *Everett v. United States*, 284

F. 203, 205 (9th Cir.1922), *cert. denied,* 261 U.S. 615, 43 S.Ct. 361, 67 L.Ed. 828 (1923).

18. Defendants argue that Olympic placed the Fierce Packer in IMAR's exclusive possession and control and that the agreement between Olympic and IMAR was a bareboat or demise charter. The essence of a bareboat or demise charter is that the charterer stands in the shoes of the owner in almost every respect. *See Guzman v. Pichirilo,* 369 U.S. 698, 699–700, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962) (noting that a bareboat charter is "tantamount to, though just short of, an outright transfer of ownership"). "Under a bareboat charter, the owner gives the charter full possession and control of the vessel for a period of time." *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.,* 1 F.3d 848, 849 n. 1 (9th Cir.1993). "The charterer is responsible for directing the operations of the vessel and providing the master and crew." *Id.* Anything short of a complete transfer is not a bareboat or demise charter. *See Guzman,* 369 U.S. at 699, 82 S.Ct. 1095. Admiralty law treats the bareboat charterer as the owner *pro hac vice* for purposes of assessing liability for wages. *See Everett,* 284 F. at 205.

19. The burden of establishing a valid bareboat charter is on the owner of the vessel. *See Guzman,* 369 U.S. at 700, 82 S.Ct. 1095. Recognizing that the existence of a bareboat charter often operates to relieve liability from the only party who can shoulder its burden, the Supreme Court, in *Guzman,* stated:

> The owner who attempts to escape his normal liability on the ground that he has temporarily been relieved of this obligation has the burden of establishing the facts which give rise to such relief.... This burden is heavy, for courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship.
>
> *Id.*

20. The agreement between Olympic and IMAR unambiguously creates a demise or bareboat charter. The charter agreement was titled "Bareboat Charter Agreement." Under the charter agreement, IMAR was responsible for operating expenses, supplies, crew payments, maintenance, repairs, and insurance for the Fierce Packer during the charter period. During the IMAR charter period, Hansen and Olympic had no control over the crew or navigation of the vessel. Olympic also had no control over hiring the crew. Although the master of the boat, Skagvik, had been recommended by Olympic, Ellis was not required to hire Skagvik.

21. Plaintiffs argue that Olympic's payment of the Fierce Packer's insurance demonstrates that Olympic had not completely transferred the vessel to IMAR. Although Olympic actually paid the insurance for the Fierce Packer, it did so only because IMAR had not paid. Paying for insurance only protected Olympic's investment in case of loss or damage to the Fierce Packer; paying for insurance did not transfer control of the vessel back to Olympic in whole or in part. The agreement was a bareboat charter despite Olympic's payment of the Fierce Packer's insurance.

22. Plaintiffs also argue that the discussions between the crew and Hansen after the second trip demonstrate that Olympic retained some control over the vessel and its crew. But Hansen had no control over the crew or their navigation. He simply asked Mallars and Skagvik to check on the possibility of continuing the cargo runs under Hansen's management. He did not order them to do so. There is no evidence that they were required to work for Hansen, KHE, or Olympic while

they were working for IMAR. These were nothing more than discussions about a possible future business venture. In fact, Mallars and Olafsson testified that they were not acting as Olympic employees while they checked out the viability of operations under new management during the third trip. They both felt that they were IMAR employees and continued to work for IMAR at this time. They did not expect to be paid by Olympic for their efforts during the third trip.

23. Finally, Plaintiffs argue that the demise or bareboat charter is invalid because IMAR was not incorporated until after the charter agreement was signed by Ellis, as president of IMAR. Plaintiffs are wrong. It is a general rule that "if a corporation, with full knowledge of a contract that was formulated before the corporation came into existence, accepts the benefits thereof, it will be required to perform the contract obligations." *Chartrand v. Barney's Club, Inc.*, 380 F.2d 97, 100 (9th Cir.1967). While Ellis signed the charter agreement purportedly on IMAR's behalf before IMAR was incorporated, IMAR was incorporated shortly thereafter, on December 3, 1999. That was before the Fierce Packer took on IMAR business on December 18, 1999. The record indicates that IMAR collected monies on cargo for the trips made by the Fierce Packer on behalf of IMAR. IMAR was also in control of the vessel from the time it was incorporated until it went bankrupt. IMAR was required to perform the charter agreement's obligations because it accepted the benefits of the charter.

24. If IMAR were not required to perform the charter agreement's obligations, then it would be Ellis, in his individual capacity, not Olympic, who would have to perform under the charter agreement. *See Frazier v. Ash*, 234 F.2d 320, 326 (5th Cir.), *cert. denied*, 352 U.S. 893,

77 S.Ct. 133, 1 L.Ed.2d 87 (1956). Generally, promoters of corporations "are personally liable on contracts made by them for the benefit of a corporation they intend to organize." *Id.* Accordingly, either IMAR or Ellis was required to perform the charter agreement's obligations. The charter agreement was not void just because IMAR had not been incorporated when the charter agreement was signed.

25. The failure by IMAR or Ellis to make full and timely payments to Olympic, as required by the charter agreement, constituted a breach of the agreement but did not render the agreement inherently void. Olympic made no attempt to terminate the agreement. Olympic has met its heavy burden of proving the existence of a valid demise or bareboat charter.

26. Because IMAR or Ellis was the bareboat charterer of the Fierce Packer, IMAR or Ellis was responsible, as owner *pro hac vice*, for paying the wages of the crew. Plaintiffs appear to have recognized this when they filed bankruptcy claims against IMAR to recover the very wages for work done under the IMAR charter that they seek in this lawsuit. Olympic is not liable to Plaintiffs on their claims for unpaid wages for work performed under the IMAR charter.

### Against the Fierce Packer In Rem.

27. "Under the common law, seamen [have] a maritime lien against the vessel to secure their wages, enforceable by an action *in rem.*" *Governor & Co. of Bank of Scotland v. Sabay*, 211 F.3d 261, 268 (5th Cir.), *cert. denied*, 531 U.S. 959, 121 S.Ct. 384, 148 L.Ed.2d 296 (2000). "The ship may be the only valuable security on which the seamen can rely." *Id.* Without the seaman's efforts in bringing the ship safely to port, "there would be no *res* against which other creditors could assert claims." *International Paint Co. v.*

*M/V Mission Viking,* 637 F.2d 382, 385, *as clarified by* 642 F.2d 160 (5th Cir.1981).

28. "Like other maritime liens, a seaman's wages lien, as noted, is enforceable in an action *in rem.*" *Governor & Co.,* 211 F.3d at 268. It "arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds." *Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 602 (5th Cir.) (en banc), *cert. denied,* 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986). "Seamen's wages liens have been referred to as 'sacred' liens." *Governor & Co.,* 211 F.3d at 268. "Accordingly, a maritime lien for seamen's wages is not subject to any filing or recording requirements." *Id.* at 269.

29. Upon arrival in Honolulu at the end of the third trip, Rodriguez, Mallars, and Olafsson were owed unpaid wages by IMAR for work done during the IMAR charter. Section 10313(f) provides that, at the end of a voyage, "the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier." 46 U.S.C. § 10313(f). There is no evidence in the record as to whether all of the cargo was discharged from the Fierce Packer upon arrival in Honolulu on February 17, 2000. Accordingly, the court holds that, under 46 U.S.C. § 10313(f), Rodriguez, Mallars, and Olafsson should have been paid their full wages for this voyage on February 21, 2000 (four days after discharge). It is undisputed that these Plaintiffs were not paid their wages for the IMAR charter on that date. As of February 21, 2000, Rodriguez, Mallars, and Olafsson had a maritime lien, enforceable *in rem,* for wages owed for work done through February 17, 2000. The Fierce Packer was liable *in rem* for those unpaid wages.

30. Skagvik was also owed unpaid wages by IMAR for his work during the IMAR charter. As noted above, Skagvik cannot recover under 46 U.S.C. § 10313. Skagvik, however, may recover under maritime contract law. The employment contract between the master of a vessel and the vessel's owner is maritime in nature, and is governed by maritime contract law. *See Union Fish Co. v. Erickson,* 248 U.S. 308, 313–14, 39 S.Ct. 112, 63 L.Ed. 261 (1919). Skagvik had a valid oral contract with IMAR for his wages during the IMAR charter. Accordingly, Skagvik had a maritime lien on the Fierce Packer *in rem.* There is no evidence in the record as to when Skagvik was to be paid. A reasonable payment date for Skagvik's wages would have been February 21, 2000 (similar to that provided under 46 U.S.C. § 10313). Skagvik therefore had a maritime lien on the Fierce Packer *in rem* on February 21, 2000. The Fierce Packer was liable *in rem* for Skagvik's unpaid wages for the work done during the IMAR charter.

### *Penalty Wage Claims.*
#### *Against Olympic In Personam.*

31. Plaintiffs seek penalty wages for their unpaid wages for work done under the IMAR charter pursuant to 46 U.S.C. § 10313(g). Section 10313(g) provides that penalty wages in the form of double wages are owed by the owner or master of the vessel. *See* 46 U.S.C. § 10313(g). Plaintiffs contend that Olympic is liable as the legal owner of the Fierce Packer because it is listed as the Fierce Packer's owner on the documentation of the vessel.

32. As noted above, if a demise or bareboat charter exists, the charterer becomes the owner of the boat under maritime law for many purposes, including responsibility for wages. *See Everett,* 284 F. at 205. Because IMAR was the owner *pro*

*hac vice* of the Fierce Packer under the IMAR charter, Olympic is not liable as owner for the penalty wages Plaintiffs seek.

■ 33. Even if the court were to deem Olympic the owner of the Fierce Packer during the IMAR charter, Olympic would be liable for penalty wages only if it withheld Plaintiffs' wages without sufficient cause. *See* 46 U.S.C. § 10313(g). Wages are withheld "without sufficient cause" when they are withheld arbitrarily, unjustly, or unreasonably. *See Mateo v. M/S KISO*, 41 F.3d 1283, 1289 (9th Cir. 1994). A "showing of good faith upon the part of the master or owner, together with reasonable cause for failure to pay wages due, undoubtedly carries considerable influence in determining whether such refusal is not without sufficient cause." *Id.* at 1290 (quotation omitted). "[W]here the facts and circumstances surrounding the wage demand are susceptible to an honest doubt as to the justness of the seaman's demand, it cannot be said that the refusal is without sufficient cause." *Id.* (quotation omitted).

■ 34. Olympic has demonstrated sufficient cause for any delay in paying Plaintiffs' wages for work done under the IMAR charter. Olympic's refusal to pay Plaintiffs their alleged wages was not "arbitrary or unreasonable." Olympic had a good faith reasonable belief that Plaintiffs' wage claims against Olympic for the IMAR charter period lacked merit. It was reasonable for Olympic to believe that Olympic had no duty to pay Plaintiffs for work done for IMAR. Although the Fierce Packer may have been subject to a maritime lien for Plaintiffs' wages, Olympic believed that IMAR was responsible for Plaintiffs' wages and believed Plaintiffs should look to IMAR for payment. Even though Olympic may have been aware that IMAR was in bankruptcy, Olympic was justified in believing that Plaintiffs' claims for wages should be made against IMAR in bankruptcy and not against Olympic. Accordingly, the court holds that Plaintiffs are not entitled to penalty wages against Olympic for the work done under the IMAR charter.

### *Against the Fierce Packer In Rem.*

■ 35. The plain language of the penalty wages statute imposes liability on only the "master or owner." *See* 46 U.S.C. § 10313(g). The jurisprudence interpreting 46 U.S.C. § 10313(g), however, grants "seamen a maritime lien against the vessel for such [penalty] wages, which attaches at the moment earned wages are not timely paid pursuant to the statute." *Governor & Co.*, 211 F.3d at 271. The court holds that Plaintiffs are not entitled to a maritime lien for seamen's wages against the Fierce Packer for work performed under the IMAR charter.

36. Penalty wage liens attach only if the owner or master of the vessel fails to timely pay wages without sufficient cause. *See Governor & Co.*, 211 F.3d at 271. As noted above, Olympic was not the owner responsible for wages during the IMAR charter under 46 U.S.C. § 10313(g). Even if Olympic was the owner, this court has found that Olympic had sufficient cause to delay payment of Plaintiffs' wages for work done under the IMAR charter. Accordingly, no penalty wage liens attached to the Fierce Packer as a result of Olympic's actions.

■ 37. Plaintiffs argue, in the alternative, that they have a penalty wage lien against the vessel based on IMAR's failure to timely pay wages without sufficient cause. However, the record before the court indicates that IMAR had sufficient cause to withhold payment from Plaintiffs. Although IMAR notified Plaintiffs that they were terminated for violating an alcohol policy, IMAR could not have paid

Plaintiffs any wages in any event because it had filed for bankruptcy. "It is well settled that the insolvency of the owner of a vessel is a sufficient cause and negates any penalty wage claim." *Bender Welding & Mach. Co., Inc. v. M/V Sovereign Opal,* 415 F.Supp. 772, 775 (S.D.Ala.1976). Although insolvency is not a prerequisite to a bankruptcy filing, IMAR's bankruptcy proceedings are strongly probative of IMAR's inability to pay Plaintiffs' wage claims. Assuming IMAR filed for bankruptcy in good faith, IMAR's withholding of Plaintiffs' wages was not "arbitrary or unreasonable." On the record before the court, Plaintiffs are not entitled to a penalty wage lien against the Fierce Packer.

### Wrongful Discharge Claim.

38. Plaintiffs also assert a claim for wrongful discharge under 46 U.S.C. § 10313(c) for IMAR's termination of Plaintiffs. They argue that IMAR improperly discharged them after they returned from the third trip.

Section 10313(c) provides:

When a seaman who has signed an agreement is discharged improperly before the beginning of the voyage or before one month's wages are earned, ... the seaman is entitled to receive from the master or owner, in addition to wages earned, one month's wages as compensation.

46 U.S.C. § 10313(c).

39. There are three reasons that Plaintiffs are not entitled to recover for wrongful discharge under 46 U.S.C. § 10313(c) for the termination of their employment under the IMAR charter. First, the plain language of the statute requires Plaintiffs to have signed agreements to recover under section 10313(c). Olafsson and Skagvik both had oral contracts with IMAR and never received any written contract. Although Mallars and Rodriguez initialed certain places in a "Master Con-

tract," they never actually signed contracts. Even if their initials constituted the necessary signing, the "Master Contract" could not be deemed a signed agreement for purposes of section 10313(c) because that document lacked material terms. In particular the document was silent as to the daily wage rates. Without a contract setting forth at least the wage rate, it cannot be said that Mallars or Rodriguez had the signed agreement required by section 10313(c).

40. Second, even if the documents that Rodriguez and Mallars initialed constituted signed agreements under section 10313(c), the statute also requires termination before a voyage commences or before one month's wages were earned. Mallars and Rodriguez were aboard the Fierce Packer for over a month and earned over one month's worth of wages before they were terminated. Moreover, Plaintiffs were terminated at the end of a voyage for IMAR, not before the beginning of the voyage.

41. Third, as noted above, IMAR was the owner *pro hac vice* for the IMAR charter period. IMAR terminated Plaintiffs' employment during this period, not Olympic. Because Olympic was not the owner during this period, Plaintiffs cannot recover against Olympic for IMAR's actions during the IMAR charter. *See* 46 U.S.C. § 10313(c) (stating that seaman are entitled to recover wrongful discharge wages against only the master or the owner).

### Olafsson's Airfare.

42. Olafsson seeks reimbursement for his airfare. He was hired in Seattle and expected IMAR to reimburse him for travel to Honolulu. Olafsson may not pursue this claim against the Fierce Packer *in rem* because Olafsson did not assert this claim in his Verified Complaint. *See* Admiralty Supp. Rule C(2)(a) ("In an

action in rem the complaint must ... be verified"). If the verification requirement is to have any meaning, Olafsson may not simply submit a verified complaint asserting certain claims, then raise other claims never mentioned in the verified complaint. Olafsson may pursue IMAR or Ellis on this claim, but, given the bareboat charter, may not recover on this claim from Olympic.

43. Olafsson is also seeking airfare from Honolulu back to Seattle. If he is seeking this return airfare as a repatriation expense connected to his initial hire by IMAR, then, for the reasons set forth in the preceding paragraph, he must seek recovery from IMAR or Ellis, not from Defendants.

**Post–IMAR Charter Period.**

### Claims Under 46 U.S.C. § 10313.

44. Plaintiffs seek wages under 46 U.S.C. § 10313 for work performed after they were fired by IMAR. Section 10313 applies only to a vessel of the United States that is "on a voyage." *See* 46 U.S.C. § 10301. The term "voyage" is not defined in the Wage Act. *See Southern Aster,* 978 F.2d at 469. The Ninth Circuit, in *Southern Aster,* examined whether the voyage requirement should be read out of the Wage Act. *See id.* at 469–70. The court recognized that the term "voyage" should be defined expansively to further the Wage Act's protective purpose. *See id.* at 470. Accordingly, the court held that a "seaman's voyage ends when his commitment to work aboard the ship is terminated, either by completion of his contract or by premature discharge." *Id.* "Under this definition, [seamen complete] their voyages when they [are] discharged even though the ships never [leave] port." *Id.* Although the *Southern Aster* court adopted this expansive definition of the term "voyage," it counseled against ignoring the voyage requirement altogether. *Id.*

45. Pursuant to the Ninth Circuit's directive in *Southern Aster,* this court cannot ignore the voyage requirement under the Seaman's Wage Act. *See* 46 U.S.C. § 10301 (this chapter applies only to vessels "on a voyage"). The purpose of the Wage Act is to "ensure that a seaman is not turned ashore with little or no money in his pocket." *Chung, Yong Il v. Overseas Nav. Co. Ltd.,* 774 F.2d 1043, 1049 (11th Cir.1985), *cert. denied,* 475 U.S. 1147, 106 S.Ct. 1802, 90 L.Ed.2d 346 (1986). When no specific voyage is involved, there is no reason for a seaman to be concerned in that regard. The seaman will never have left shore or even have prepared to leave shore. He or she therefore need not worry about being turned ashore with empty pockets. *See id.*

 46. Plaintiffs can recover under 46 U.S.C. § 10313 only if their work is related to a discrete, specific, and imminent voyage. If a voyage is a mere possibility or hope, section 10313 does not apply. Under the facts of this case, Plaintiffs cannot recover under 46 U.S.C. § 10313 for the work they performed for Olympic after February 17, 2000. Neither Hansen nor Schultz made any commitment to make a voyage to Christmas Island, Fanning Island, or Seattle. These voyages were merely possibilities discussed among Hansen, Schultz, and the crew. There was never a discrete, specific, and imminent voyage. They had hoped beyond hope that a voyage would commence sometime in March, but that is all. To allow recovery under section 10313 when only a hope of a voyage is involved would be to read the voyage requirement out of the statute. Plaintiffs cannot recover wages or penalty wages under section 10313 for work performed after the IMAR charter period ended on February 17, 2000.

*Wage Claims Under Maritime Contract Law.*

### Against Olympic Packers.

47. Although Olafsson, Mallars, and Skagvik cannot recover for the work they performed after February 17, 2000 under 46 U.S.C. § 10313, they may pursue claims under general maritime contract law. A seaman's contract to work aboard a vessel is a maritime contract. *See Aqua–Marine Constructors, Inc. v. Banks,* 110 F.3d 663, 670–71 (9th Cir.), *cert. denied,* 522 U.S. 933, 118 S.Ct. 339, 139 L.Ed.2d 263 (1997). "As a general rule, admiralty law applies to maritime contracts." *See id.* at 670.

48. Under the choice of law rules in maritime contract cases in the Ninth Circuit, the court must apply the law of the state "which has the most significant relationship to the transaction." *Id.* at 674 (citing Restatement (Second) of Conflict of Laws § 188(1) (1971)). In making a choice of law determination under federal maritime law, the court must consider: (a) the place of contracting; (b) the place of negotiation; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *See Aqua–Marine,* 110 F.3d at 673. Hawaii law clearly applies to this case.

49. Olympic argues that Hansen and Schultz never entered into any contract with Skagvik, Olafsson, or Mallars. In Hawaii, for a binding contract to exist, there must be mutual assent or a meeting of the minds on all essential terms. *Carson v. Saito,* 53 Haw. 178, 182, 489 P.2d 636, 638 (1971); *Earl M. Jorgensen Co. v. Mark Constr., Inc.,* 56 Haw. 466, 470, 540 P.2d 978, 982 (1975). The existence of mutual assent is determined by reviewing a party's words or acts under an objective standard. *See id.*

50. Skagvik testified that, on February 17, 2000, Hansen asked Skagvik to stay on the Fierce Packer, keep it operational, and wait for Schultz, who would be traveling to Hawaii from Korea. Skagvik says he was told by Hansen to ask the rest of the crew to stay and work the Fierce Packer until Schultz arrived. According to Skagvik, Hansen promised Skagvik that he and the crew members would be paid for the work they performed after February 17, 2000. Hansen denies having made any commitments on behalf of KHE or Olympic to Skagvik on February 17, 2000. On this point, as noted above, the court has found in favor of Skagvik. There was an oral agreement to pay wages to Skagvik, Olafsson, and Mallars, at the same rate paid by IMAR, in exchange for work done on the Fierce Packer after February 17, 2000.

51. Upon arriving in Honolulu on February 21, 2000, Schultz also agreed that Olympic would pay Plaintiffs. Olympic was bound by its oral contracts to continue to pay Plaintiffs.

52. Defendants argue that, even if Olympic had oral contacts with Plaintiffs, the contracts were not binding on Olympic because Hansen and Schultz are not Olympic's agents or employees. The court disagrees. "Federal maritime law embraces the principles of the law of agency." *Stevens Technical Services, Inc. v. SS Brooklyn,* 885 F.2d 584, 589 (9th Cir.1989). "The Restatement (Second) of Agency has been adopted in maritime law as an accurate statement of applicable general agency principles." *Id.* Under the Restatement, "agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." Restatement (Second) of Agency § 1(1) (1958). The court finds that Han-

sen and Schultz, as the vessel management company's employees, were Olympic's agents. They had the authority to hire and fire the crew for the Fierce Packer, enter into contracts with others for the Fierce Packer's business, and bind Olympic on those contracts.

53. Moreover, Defendants' counsel asserted at trial that Olympic's vessel manager in Honolulu, Anne Stevens, was an Olympic agent for discovery purposes. Defense counsel argued that Plaintiffs' counsel should not have contacted Stevens directly, but instead should have gone through defense counsel, as counsel for Olympic considered Stevens, as Olympic's agent, to be his client also. The court sees no reason to treat Hansen and Schultz differently from Stevens for agency purposes.

54. "A disclosed or partially disclosed principal is a party to a contract if made within the agent's authority." Restatement (Second) of Agency § 147 (1958). Because the crew knew that Hansen and Schultz represented Olympic, Olympic was a disclosed principal and liable on the contracts for work performed on the Fierce Packer after February 17, 2000. *See Stevens*, 885 F.2d at 589–90.

55. Even if Olafsson, Mallars, and Skagvik did not have express agreements with Olympic, they can recover against Olympic under *quantum meruit*. "The basis of recovery on *quantum meruit* is that a party has received a benefit from another which it is unjust for him to retain without paying for." *Maui Aggregates, Inc. v. Reeder*, 50 Haw. 608, 610, 446 P.2d 174, 176 (1968). "If a party derives any benefit from services rendered by another, the law reasonably implies a promise to pay on the part of the one who has received such benefit, such amount as it is reasonably worth." *Id.* (quotation omitted). Olympic, through its representatives, was aware that Olafsson, Mallars, and Skagvik were working on the Fierce Packer after February 17, 2000. Because Olympic derived a benefit from their services, the court implies a promise by Olympic to pay reasonable wages for their work after February 17, 2000. The daily wage rate that the crew had agreed to with IMAR is a reasonable estimate of the worth of their services, especially as there was testimony that crew members had been paid their regular wages when they had worked in port on other occasions.

56. Finally, Defendants argue that Olympic is not responsible for Olafsson's wages after the Fierce Packer was arrested. "It is well settled that no maritime lien can be allowed to seamen for wages accruing subsequent to the time the ship is taken into *custodia legis* and [that is] particularly true where, as here, the libel is filed by the crew of the vessel." *Putnam v. Lower*, 236 F.2d 561, 570 (9th Cir.1956). Although this is the general rule, courts have allowed recovery against owners, *in personam*, for breach of the seaman's employment contract. *See id.* Regardless of whether Schultz had authority under law to hire Olafsson while the vessel was arrested, Schultz did hire Olafsson. The custodian of the vessel agreed to allow Schultz and Olafsson to stay and work on the Fierce Packer to save costs. Had the custodian not permitted this, the custodian would have incurred costs that Olympic would ultimately have had to pay. Under these circumstances, the court holds that Olafsson may maintain his breach of maritime contract claim against Olympic for the work he performed after the vessel was arrested.

### Against the Fierce Packer.

57. Defendants argue that Plaintiffs cannot recover any of their claims against the Fierce Packer *in rem* for work that was performed after the IMAR charter

period. Defendants contend that Plaintiffs' claims arising out of the work they performed after the IMAR charter period are unverified and therefore must be denied. Defendants are correct.

58. As noted earlier, an *in rem* action pursuant to Admiralty Supp. Rule C is available to enforce a maritime lien. In an action *in rem*, the complaint must be verified. *See* Admiralty Supp. Rule C(2)(a). The failure to verify a claim will result in the denial of the maritime lien. *See Goodman v. 1973 26 Foot Trojan Vessel*, 859 F.2d 71, 74 (8th Cir.1988) (requiring dismissal of *in rem* action for failure to verify claims). Because Plaintiffs did not verify their claims for wages for work done after the termination of the IMAR charter, no lien for these claims attached to the Fierce Packer *in rem*.

59. Similarly, if Olafsson is seeking reimbursement for his airfare from Honolulu back to Seattle as part of his post-IMAR entitlement, he may not recover from the Fierce Packer *in rem* because he did not seek that recovery in his Verified Complaint. The Verified Complaint is also silent as to Olafsson's rental car costs and Skagvik's telephone charges.

### Miscellaneous Post–IMAR Claims Against Olympic.

#### Olafsson's Rental Car.

60. Schultz agreed to reimburse Olafsson for the cost of the rental car from February 21 to March 17, 2000. That agreement is binding on Olympic.

#### Skagvik's Telephone Bill.

61. Olympic was also bound by the contract entered into by Schultz and Skagvik to pay for Skagvik's business calls on his cellular telephone.

#### Olafsson's Airfare to Seattle.

62. By contrast, there is no evidence that Olympic agreed to pay for Olafsson's airfare back to Seattle from Honolulu. In the absence of any agreement on this sub-

ject, the court sees no basis for holding Olympic liable for paying for Olafsson to return to Seattle. He was hired in Honolulu after returning from the third voyage for IMAR. He ended his employment for Olympic in Honolulu. Seattle was not part of the agreement.

#### The Next Voyage.

63. Plaintiffs argue that Olafsson, Mallars, and Skagvik are entitled to wages they would have earned had they gone on the Fierce Packer's next voyage to Christmas Island and Fanning Island. Their argument is premised on their claim that, on that next voyage, the Fierce Packer carried cargo they had helped to obtain. However, there is no evidence that any of the cargo eventually shipped out on the Fierce Packer had actually been gathered by them. Nor is there evidence that, while they were working for Olympic, an actual voyage was planned or even anticipated. As this court noted earlier, the parties only hoped that a voyage would occur and were trying to make that a reality, but no one had any assurance that a voyage would actually occur. Certainly no voyage occurred on March 12, 2000, which was the date Skagvik had hoped to return to Honolulu. Accordingly, Plaintiffs are not entitled to recover wages for the alleged next voyage.

#### Costs to Arrest Vessel.

64. Plaintiffs also seek to recover the costs that they incurred in arresting the vessel. However, Plaintiffs fail to cite any authority that allows them to recover these costs against Defendants. It appears from the record that the only costs incurred by Plaintiffs in arresting the vessel were attorney's fees. Plaintiffs do not cite authority standing for the proposition that attorney's fees incurred in arresting a vessel should be treated differently from attorney's fees incurred in admiralty litigation generally. Given Plaintiffs' failure to

meet its burden on this issue, the costs of arresting the vessel are not awarded to Plaintiffs.

### Attorney's Fees.

65. Attorney's fees are awardable in admiralty cases when there has been a bad faith failure to pay wages. *Vaughan v. Atkinson,* 369 U.S. 527, 530, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). The court has found no bad faith here. Therefore, attorney's fees are not awarded.

### Prejudgment Interest.

66. Damages are the amount of money that will reasonably and fairly compensate a plaintiff. It is well established that compensatory damages in maritime cases normally include prejudgment interest. *See Western Pac. Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1288 (9th Cir.1984). Although the award of prejudgment interest is within the discretion of the trial judge, this discretion must be exercised with a view to the fact that prejudgment interest is an element of compensation, not a penalty. *See id.; Columbia Brick Works, Inc. v. Royal Ins. Co.,* 768 F.2d 1066, 1068 (9th Cir.1985) ("In admiralty law, the district court has discretion to award prejudgment interest to accomplish the just restitution of injured parties"). The court also has broad discretion to determine when prejudgment interest commences and what rate of interest to apply. *See Columbia Brick,* 768 F.2d at 1068.

67. In determining the appropriate prejudgment interest award, the Ninth Circuit has adopted the standards set for post-judgment interest set forth in 28 U.S.C. § 1961(a). *See Western Pac.,* 730 F.2d at 1289 ("We conclude that the measure of interest rates prescribed for post-judgment interest in 28 U.S.C. § 1961(a) is also appropriate for fixing the rate for pre-judgment interest in cases such as this, where pre-judgment interest may be awarded, unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate"); *Columbia Brick,* 768 F.2d at 1071 ("We have determined that the measure of interest rates prescribed for postjudgment interest in 28 U.S.C. § 1961(a) is also appropriate for fixing the rate for prejudgment interest unless the equities of a particular case demand a different rate").

68. Interest awards are governed by 28 U.S.C. § 1961(a), which states:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1 year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

28 U.S.C. § 1961(a).

69. The most accurate way to fully compensate a plaintiff is to award prejudgment interest from the date of injury, but at a fluctuating rate. *See Saavedra v. Korean Air Lines Co.,* 93 F.3d 547, 555 (9th Cir.), *cert. denied,* 519 U.S. 1029, 117 S.Ct. 584, 136 L.Ed.2d 514 (1996). The Ninth Circuit has held that a district court does not abuse its discretion by ordering that "all prejudgment interest calculations were to commence at the time of the injury. The district court is not obliged to tie every aspect of recovery to a different date when determining the date or dates from which interest will accrue." *Barnett v. Sea Land Serv. Inc.,* 875 F.2d 741, 746–47 (9th Cir.1989).

70. Discretion is abused if prejudgment interest amounts to a penalty rather than compensation. *See Columbia Brick,* 768 F.2d at 1068.

 71. This court concludes that, under the circumstances of this case, prejudgment interest on the wages for the IMAR charter period should not be awarded against Defendants. Plaintiffs may pursue that claim against IMAR or Ellis. However, this court does award prejudgment interest on wages and expenses owed by Olympic for work performed after February 17, 2000. Olympic agreed to pay for this work and for these expenses and has had the benefit of having that money itself for over a year. The parties did not have an agreement on when they would be paid, but the court concludes that payment should have been made on the day Plaintiffs' oral contracts with Olympic ended. Prejudgment interest runs from the time the payment was due. Therefore, the court awards prejudgment interest to Skagvik and Mallars from March 5, 2000, and to Olafsson from March 17, 2000.

### ORDER.

The court denies Plaintiffs' motion to increase the bond because the court awards Plaintiffs less than the $135,000 bond. Defendants' bond is released.

The court denies both Plaintiffs' and Defendants' motions for judgment as a matter of law.

The court awards judgment to Defendants on Madeja's claims.

The Fierce Packer was liable *in rem* for the unpaid wage claims of Rodriguez, Olafsson, Mallars, and Skagvik for the work they performed under the IMAR charter. Rodriguez, Olafsson, Mallars, and Skagvik were paid these unpaid wages by Olympic before trial, and the court awards no further damages in favor of Plaintiffs on their *in rem* claims. Judgment is entered against Rodriguez.

Olympic is liable *in personam* for the unpaid wage claims of Olafsson, Mallars, and Skagvik for the work they performed for Olympic after February 17, 2000. The court awards compensatory damages and prejudgment interest from the date the wages were due against Olympic *in personam* and in favor of Olafsson, Mallars, and Skagvik. The court orders that judgment be entered against Olympic *in personam* and in favor of: (1) Olafsson in the amount of $7176.79; (2) Mallars in the amount of $4560.66; and (3) Skagvik in the amount of $5152.53.

The Clerk of Court is directed to enter judgment in this case and to close this file.

IT IS SO ORDERED.